THE LAW OFFICES OF
# VINCENT J. MARTINELLI
ATTORNEY AND COUNSELOR AT LAW

*Executive Suites at The Park*
900 SOUTH AVENUE – 3rd FLOOR
STATEN ISLAND, NY 10314
TELEPHONE: (718) 667-0500
VJMLAW@si.rr.com

ADMITTED IN NEW YORK
AND NEW JERSEY

April 13, 2021

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        **Re: United States v. Vincent Scura**
          Docket No. 19-CR-442 (BMC)

Dear Judge Cogan:

  Please accept this letter as a sentence memorandum on behalf of Mr. Vincent Scura, currently scheduled to be sentenced on April 27, 2021 at 10:00AM.

  By and through this sentence memorandum, and any oral arguments made at his sentence hearing, I respectfully submit that a sentence of 12 months incarceration whereby 6 months of the 12-month sentence is served as incarceration and 6 months is served as home detention, with leave for work and certain specific other enumerated leave (religious, medical, food shopping, etc.), is sufficient but not greater than necessary to satisfy all of the sentencing objectives of 18 USC § 3553(a)(1-7).[1]

## BACKGROUND

  On October 3, 2019 Mr. Scura was arrested pursuant to a 16-defendant Indictment, and charged solely with a single count of extortionate collection of credit from John Doe # 14 (Count 30), as a "non-RICO" offense. He was immediately released

---

[1] This recommendation would be only a 1-level downward variance from the Level 14 adjusted guideline range bargained for in the plea agreement with the government, but would equate to the low-end of the guidelines range at Level 13 and it would include a "split" sentence, as allowed for Zone C. Furthermore, it should be noted that Mr. Scura was one of the earliest of the group of defendants to accept a plea agreement with the government prior to the "global point" requirement deadline of October 31, 2020 and may have probably been a catalyst for a 10-defendant resolution of the Indictment.

on a secured bond and has been fully compliant with all Pre-Trial Services conditions.

On September 28, 2020, Mr. Scura pled guilty to the Indictment. A Presentence Investigation Report was delivered to me on or about March 4, 2020 and the defendant made certain objections to that report on March 17, 2020, ECF No. 473. His primary objection was that the probation department did not calculate for a minor role reduction of 2-levels, though his plea agreement with the government did calculate a minor role in the offense. To date, I have not received any addendum or final report addressing the objections.

## DISCUSSION

**I.     Legal Standard**

As the Supreme Court said in Pepper v. United States, 131 S.Ct. 1229 (2011), the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Id., 131 S.Ct. At 1240 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in United States v. Booker, 125 U.S. 738 (2005), which "breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the Section 3553(a) factors to the criminal defendants that come before them." United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008) (district court must make an "individualized assessment" of the sentencing warranted by 3553(a) "based on the facts presented" and "may not presume that the Guidelines range is reasonable"). The deference granted a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as its familiarity with the individual case and the individual defendant before it." Id. at 170.

Consistent with the principle of individualized sentencing is the wide discretion afforded the sentencing judge "in the sources and types of evidence used to assist in determining the kind and extent of punishment to be imposed", in particular, "the fullest information possible concerning the defendant's life and characteristics". *Pepper*, 131 S.Ct. At 1240 ("sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant"). Indeed, as *Pepper* points out, this principle is codified in 18 U.S.C. 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Pepper v. United States, 131 S.Ct. 1229, 1242 (2011).

In United States v. Booker, 543 U.S. 220 (2005) the Supreme Court rendered the Sentencing Guidelines "effectively advisory". *Booker*, 543 U.S. at 245. Post-*Booker*, as the Second Circuit observed, [i]t is now ... emphatically clear that the Guidelines are guidelines - that is, they are truly advisory. *Cavera*, 550 F.3d at189.

As a procedural matter, district courts "must treat the Guidelines as the starting point and the initial benchmark in calculating a sentence. Kimbrough v. United States, 552 U.S. 85, 108 (2007) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). However, sentencing courts may not presume that a Guidelines sentence is reasonable. See Nelson v. United States, 129 S.Ct. 890, 891-92 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable" [emphasis in original]); see also *Cavera*, 550 F.3d at 189 ("district court may not presume that a Guidelines sentence is reasonable"). Additionally, the Guidelines may not be assigned any presumptive weight over the other factors set forth in § 3553(a). United States v. Fierkhoglyad. 516 F.3d 122, 131 (2d Cir. 2008).

*Gall*, *Kimbrough*, and *Nelson* have effectively restored the district courts' broad sentencing discretion by permitting them to impose a sentence after considering all the USSG § 3553(a) factors, with the Guidelines being only one such consideration. United States v. Jones, 531 F.3d 163, 173-74 (2d Cir. 2008). Adhering to *Booker* and *Jones*. Section 3553(a) requires this Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in § 3553(a)(2).

All of these factors heavily weigh in the favor the recommended sentence of 12 months incarceration at Level 13 - but that it be served as a "split sentence" of 6 months incarceration and 6 months home detention (with leave for work and other specific events) as allowed for in Zone C of the guidelines.

## II.  Analysis

The recommended sentence, would be sufficient but not greater than necessary to satisfy the statutory mandates of 18 USC § 3553(a)(1-7), as follows.

### A.  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The Nature and Circumstance of the Offense

Paragraph 35 of the PSR makes no mistake that *prior to* Mr. Scura's involvement with John Doe # 14 related to the charged count (count 30), John Doe # 14 *already had* a pre-existing loan with another "Individual" unrelated to this indictment for $5,000 at "3-points" per week ($150 per week). Paragraph 35 of the PSR also clearly establishes that at the very same time as that loan with that "Individual", John Doe # 14 had a different, *second loan* with a co-defendant on this case who has already plead guilty and been sentenced. Again, both of these loans were unrelated to Mr. Scura.

Finally, Paragraph 35 of the PSR properly recites that when the "Individual" on the first loan complained to Mr. Scura about John Doe # 14 not paying the $5,000 loan back, Mr. Scura's only involvement with this matter was to merely refer John Doe # 14 back to the co-defendant who Mr. Scura knew had a second loan with John Doe # 14 for the co-defendant to assume the first loan from the "Individual".

Paragraphs 36-40 of the PSR then goes on to recount five different conversations

between John Doe # 14 and the co-defendant from April 25, 2019 through June 4, 2019 - none of which involve Mr. Scura speaking - which seemingly confirms that the co-defendant agreed to assume the first loan from the "Individual" because the co-defendant already had an existing loan with John Doe # 14 anyway, and that Mr. Scura recommended the co-defendant take the new loan.

There is no other criminal activity, whatsoever, involving Mr. Scura mentioned in this indictment.

The History and Characteristics of the Defendant

Mr. Scura stands before this Court at 60-years of age having never been convicted of any crime. As the PSR properly reflects in paragraphs 101 - 108

> **The defendant was born Vincent Anthony Scura on April 13, 1961, in Brooklyn, New York. He is the only child born to the lifetime marriage of Raymond and Filomena (nee Petrone) Scura. … The father, a laborer, died in 1987, at the age of 54, from internal bleeding. The defendant believed he may have had cancer. The mother (age 84) lives with the defendant. She is a retired seamstress, and is in remission from colon cancer, first diagnosed 3 years ago. The mother is aware of the defendant's conviction and is supportive.**
>
> **As noted, the defendant is an only child. He was reared in a middle-income household in the Bay Ridge section of Brooklyn, free from hardship, financial or otherwise. The defendant reported an "excellent" relationship with both of his parents, and no problems at school or in the neighborhood. He acknowledged that he was "very fortunate" and credits his parents for providing a safe, loving environment.**
>
> **In the late 70s, the defendant met his ex-wife, Rosemarie (nee: Governale) Mara (age 60) through the neighborhood. They maintained a relationship for approximately 5 years before marrying in 1983, in Brooklyn. … They divorced approximately 10 years ago, due to increased differences; however, he reported a friendly relationship with the ex-wife, who is now remarried. The ex-wife is healthy and sells real estate. She is aware of the defendant's conviction and is supportive.**
>
> **Three children were born from the defendant's marriage, all of whom are healthy. Danielle Scura (age 38) is single with 2 children, lives on Staten Island in the apartment below the defendant and works part-time at his restaurant. Vincent Scura, Jr. (age 36) is married with 3 children, lives on Staten Island, and works for a car dealership. Raymond Scura (age 31) is single with no children, and lives on Staten Island. … The children are all aware of the defendant's conviction**

**and are supportive.**

**In a telephonic interview with the son, Vincent Scura, Jr., he corroborated the defendant's personal history as reported during the presentence interview. The son described his father as a great person and a good father. The defendant is close with the son's children and is a good grandfather. Regarding the instant offense, the son is not aware of how or why he became involved. The son is supportive and requested leniency from Your Honor with respect to sentencing.**

**The defendant lived in Brooklyn until approximately age 25. He moved to Staten Island, where he has lived ever since. The defendant reported overseas travel consisting of vacations to Italy, Aruba and Jamaica. He has lived at the address of record for approximately 10 years. A home visit to the address of record by his supervising Pretrial Services Officer revealed a detached, 2-family home in the Dongan Hills neighborhood of Staten Island. The defendant lives in the 1st level apartment which has 3-bedrooms and 2-bathrooms. The mother lives in his residence, and the daughter lives in the downstairs apartment.**

**The defendant suffers from sleep apnea, first diagnosed 6 years ago. He requires a C-pap machine to sleep. He also reported suffering from double vision and is currently awaiting a diagnosis from his physician.**

Mr. Scura has worked his whole adult life. He sold a restaurant linen-supply business approximately twenty years ago and has since been an owner-operator of small pizza restaurants. His most recent pizza restaurant was purchased in 2013 in Cranford, NJ, named Scaturro's Pizzeria Café, and he has a manager and about a half-dozen employees that he supports. However, while operating his pizzeria he started a credit card processing business named Crown Business Solutions. It operates out of his pizzeria in his "down time" and the business primarily consists of telephone and in-person sales to other restaurants to help with their credit card processing for which he earns a small fee that also saves the restaurant customers money from larger, corporate processing services. Again, he has worked hard everyday of his adult life since dropping out of High School in the 10th grade and has always maintained steady employment.

Finally, he is essentially the caretaker for his cancer-stricken, 84-year-old mother, Filomena, his adult daughter, Danielle, and Danielle's 2 young boys (Mr. Scura's grandchildren ages 9 and 5), whom all live with him.

Mr. Scura's mother, Filomena, writes to Your Honor:

**I am an 84 year old woman and not in good health. I was diagnosed three and a half years ago with Colon Cancer, and I suffer daily with severe asthma. To say I could not survive without my son, my only**

**child Vincent would be an understatement. Vincent not only assists me daily in my day to day life, he lives with me and is my sole caretaker. Vincent is my constant and only companion and I literally can not survive without his constant help.**

**I live on a fixed income of approximately $800 per month Social Security. In this day and age, that does not get me much, unfortunately. Vincent is not only my caregiver, but he provides for all of my expenses, including the bills for the home, my prescriptions, food and all other items that I need to live. My son Vincent and I live also reside together, thankfully, <u>as I am in need of 24/7 care and supervision</u>.** (Emphasis added)

**I wanted to speak about Vincent and his impact on my life. As I mentioned, I have no other children. It has always been just he and I. I have grown accustomed to only being cared for by him, we are together each day and he is my closest confidant. Your honor, at my age. It is difficult to find purpose, or a true reason to live. I would like to think, and I emphatically know, I mean just as much to my Vincent as he means to me. That is the relationship we have and I am blessed to have it.**

Clearly Mr. Scura potentially has help with his mother Filomena from his own son Vincent and his daughter Danielle. But they have their own families and obligations. Mr. Scura's extended absence above and beyond the recommended term - whereby it would be virtually impossible for Vincent and Danielle to pick up the slack - would cause Filomena to suffer severely.

His son Vincent and daughter Danielle expand on that in their own letters. Vincent writes:

**My father is a father of three children, a daughter and two sons. He is a loving, kind and personable man. He has always been a provider for our family. He always taught us the importance of how valuable family truly is. He has taught me all I know today on how to raise a family and be a loving father and husband. He has always been by my side through the most important times in my life. He was by my side for my wedding, through all of his grandchildren's births and through their firsts in life. He has helped me through one of my toughest moments in my life when my youngest son, who is now 5 was diagnosed with Type 1 Diabetes. He helped me get through the darkest of moments and stood by me through all the pain and sadness.**

**From as far back as I could remember, whatever I asked for he was always there home for dinners, holidays and important milestones growing up. Family was and still is the single most important thing to our family. To show up and to just be there for whatever it may be is**

**what he always taught us. My children adore him and always look for him. They light up whenever they see him. He is a great grandfather to them . He loves spending time with them and that's what matters most.**

And Danielle perfectly summarizes the extraordinary need that his family has for his support by writing:

**I am currently unemployed due to Covid and living with my father, grandmother and two children. During this difficult time my father has truly shown us how much we mean to him and how much he supports us. He has always been there for me as a child and now for me as an adult. He has stepped up and truly showed my children and I the true definition of a grandfather. He never says no, even if he can not do it, he always makes it work for us. He treats my children as if they were his own. They look up to him and love being with him.**

**He is currently helping me through one of my toughest times in my life. I don't know what I would do without him. He is like a second father to my children, who adore him. He has shown me what family truly means and how to always be there for one another through all the ups and downs.**

Finally, Mr. Scura's girlfriend, Dina Martinelli-Palmer[2], writes to Your Honor as well. And with respect to the care Mr. Scura provides for his elderly mother, she writes:

**He is a driving force in his mom and children's live. If I may be frank, your Honor, I just do not know how his moms health will remain in a somewhat healthy pattern if he is unable to care for her; as he is the only caregiver she knows and responds to.**

Please s*ee* the entirety of the four (4) letters attesting to Mr. Scura's life and good character, attached as Exhibit A for the Court's convenience.

### B. The Need for the Sentence Imposed

The Court must consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The recommended sentence of 1-year incarceration but as a "split sentence" of 6 months of incarceration to be followed by 6 months of home detention would easily reflect the seriousness of this offense, as well as promote respect for the law and provide

---

[2] Ms. Martinelli-Palmer is my own first cousin, and she is who referred Mr. Scura to me for representation.

just punishment, adequate deterrence, and protection from the public from the further of the defendant's crime. As an initial matter, any punishment will leave Mr. Scura with a federal criminal felony record that will haunt him his whole life. And the recommended sentence would promote significant respect for the law and obvious just punishment. A sentence of 6 months incarceration, to be served during these uncertain and dangerous COVID times, to be followed by detention in Mr. Scura's home for another 6 month period, to be followed with an appropriate term of supervised release would be indeed a serious sentence related to the involved criminal activity, here.

Finally, as Paragraph No. 135 of the PSR properly states:

**As a result of a felony conviction, defendants face a potentially broad range of collateral consequences. Numerous federal and state laws place various restrictions on defendants, many of which attach automatically upon conviction. Some of these collateral consequences include the denial of government benefits, ineligibility for public housing, suspension of student loans, revocation or suspension of driver's licenses, and the inability to enlist in the military, or to serve on a jury or to vote. The potential collateral consequences of a felony conviction are numerous and circumstance-specific.**

One example of how such collateral consequences have effected Mr. Scura is that he was denied last spring for his application to the federally-funded *Payroll Protection Program* and the related *Economic Injury Disaster Loan* - financing that he was desperately counting on to help his struggling pizzeria for payroll to employees, rent, supplies, etc. - and as a result he is now actively attempting to sell his pizzeria without much success.

### C. The Kinds of Sentences Available

Mr. Scura agrees with the PSR at ¶¶ 123, 125, 127, and 129 which correctly analyzes all available statutory maximums. There is no statutory minimum for any term of custody, term of supervised release or fine amount. A special assessment of $100 is mandatory. 18 USC § 3013.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

Mr. Scura does not agree with the Guidelines range analysis listed in the PSR at ¶¶ 93, 124, 126, 128 and 136 but does agree with the Guidelines range in the plea agreement with the government.

In the plea agreement, the defendant bargained for a 2-level reduction for a minor role in the offense under Guideline 3B1.2. Section 3B1.2 provides for a two level decrease to the offense level if the defendant was a minor participant in any criminal activity. USSG §3B1.2. "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

USSG §3B1.2, comment. (n.3(C)). The defendant bears the burden of proving by a preponderance of the evidence that he or she is entitled to a mitigating role adjustment. See United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001).

Application Note 3(A) explains that §3B1.2 operates to provide "a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." USSG §3B1.2, comment. (n.3(A)). Application Note 5 provides that §3B1.2(b)'s 2-level reduction for minor participants applies to defendants who are "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." USSG §3B1.2, comment. (n.5). See generally United States v. Broussard, 882 F.3d 104, 111 (5th Cir. 2018) ("A minimal participant is someone who lacks knowledge or understanding about the scope or structure of the enterprise; a minor participant is someone who is less culpable than most participants but more culpable than a minimal participant.").

Whether the defendant is entitled to a mitigating role adjustment, was a minimal or minor participant, or occupied a role falling between minimal and minor, is "heavily dependent upon the facts of the particular case." USSG §3B1.2, comment. (n.3(C)). Application Note 3(C) to §3B1.2 provides a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment and, if so, the amount of the adjustment. The Note directs the court to consider: (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (5) the degree to which the defendant stood to benefit from the criminal activity. The Commentary also emphasizes that the mere fact that a defendant performed an "essential or indispensable role in the criminal activity" is not conclusive in determining whether to apply a mitigating role adjustment and that such defendant, if otherwise eligible, may receive a mitigating role adjustment. Id.

All five (5) factors above lean heavily in Mr. Scura's direction, as mentioned, above. The fact that his only activity was not one of traditional "collection", but that he merely referred John Doe # 14 (who had his *own* loan with an "Individual") to the co-defendant (who also had his *own* loan with John Doe # 14) when the Individual complained of untimely payments touches on all five elements, above.

The Second Circuit has held that in "evaluating a defendant's role," the sentencing court should consider factors such as "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." See United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002); see also United States v. Kirk Tang Yuk, 885 F.3d 57, 89 (2d Cir. 2018). The Third Circuit has concluded that those same factors can be "highly useful in assessing a defendant's relative

culpability," at least "where a great deal is known" about the criminal organization. <u>United States v. Rodriguez</u>, 342 F.3d 296, 299 (3d Cir. 2003). See also United States v. <u>Self</u>, 681 F.3d 190, 201 (3d Cir. 2012). The Seventh Circuit has held that in order to determine whether to apply §3B1.2, the courts should look at the defendant's role "in the conspiracy as a whole, including the length of his involvement in it, his relationship with the other participants, his potential financial gain, and his knowledge of the conspiracy." <u>United States v. Orlando</u>, 819 F.3d 1016, 1025 (7th Cir. 2016).

Again, the PSR itself, as mentioned above, describes how Mr. Scura was merely a conduit for John Doe # 14 to pay off "Lender A" on a $5,000 loan with a new loan from "Lender B", being that John Doe # 14 also had a separate loan from "Lender B" anyway. Thus, Mr. Scura is not "collecting" any loan in the traditional sense. A minor role for his activities is warranted, as outlined in the plea agreement with the government.

This would make the appropriate Guideline Range, as listed in the plea agreement, *without* any downward variance Level 14, 15-21 months incarceration in Zone D.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement issued by the Sentencing Commission." 18 USC § 3553(a)(5).

This factor is not relevant to Mr. Scura's sentencing.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth§ 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The range of sentences for similarly situated defendants in this district for single-count, "non-RICO" extortionate collection of credit crimes based on a $5,000 loan - whereby the "collection" aspect is merely referring the debtor to a different lender to consolidate a loan the victim already separately had with that lender - might be difficult to precisely compare. However, from my experience on other multi-defendant cases involving other much more serious RICO allegations, I respectfully submit that downward variances have been very common in this district.

### G. The Need to Provide Restitution

Finally, the seventh§ 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

This factor is not relevant to Mr. Scura's sentencing.

## CONCLUSION

I respectfully submit that a "split sentence" of 6 months incarceration to be followed by 6 months home detention, as outlined above, and a $100 mandatory special assessment is appropriate and comports with the dictates of Title 18, Section 3553.

This sentence is consistent with and is sufficient but no greater than necessary to accomplish the purposes of section 3553(a)(2).

Thanking you in advance for your time and consideration.

Very truly yours,

*Vincent Martinelli*

Vincent J. Martinelli

CC: All Parties via ECF