

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EAG
F. #2018R01021

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 20, 2021

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Vincent Scura
      Criminal Docket No. 19-442 (S-1) (BMC)

Dear Judge Cogan:

  The government respectfully submits this letter in connection with sentencing of the defendant Vincent Scura and in response to the defendant's sentencing memorandum, filed on April 13, 2021, and his objections to the Pre-Sentence Investigation Report ("PSR"), prepared on March 17, 2021.  Sentencing is currently scheduled for April 27, 2021.  In his memorandum, the defendant seeks a sentence of 6 months' imprisonment and 6 months' home confinement.  For the reasons described herein, the government respectfully asks the Court to impose a sentence within the applicable Guidelines range, which the government submits are 15 to 21 months' imprisonment.

## BACKGROUND

I. <u>The Defendant's Membership in the Colombo Organized Crime Family</u>

  According to multiple witnesses, the defendant Vincent Scura is an inducted member of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"). In becoming an inducted member, Scura swore allegiance for life to the crime family above all else, even his own family.

II. <u>Overview of Offense Conduct</u>

  In or about the Winter of 2018, the defendant Vincent Scura introduced the individual identified in the superseding indictment and herein as John Doe #14, an individual

whose identity is known to the government, to an individual identified herein as coconspirator #1 ("CC-1") so that John Doe #14 could borrow a sum of money from CC-1. In exchange, John Doe #14 agreed to pay CC-1 a weekly interest rate of three points or three percent. In or about the Spring of 2019, John Doe #14 stopped making interest payments to CC-1 and CC-1 enlisted the defendant's assistance in collecting the debt. In turn, Scura reached out to co-defendant Thomas Scorcia, another Colombo family member, to whom John Doe #14 also owed money. Scorcia's subsequent communications with John Doe #14 were then intercepted over a court-authorized wiretap and are described in part below.

For example, on April 25, 2019, John Doe #14 spoke with Scorcia about the debt owed to CC-1 that the defendant was assisting in collecting. During the call, Scorcia referred to Scura as the father of a friend of John Doe #14 who lived across the street from John Doe #14. A portion of the call is transcribed below.

> Scorcia: All right, listen, another thing that I wanted to go over...
>
> John Doe #14: Yeah
>
> Scorcia: ...and, and I don't want to go over the phone, y-, y-, y-, y-, your friend's buddy, the father, [referring to Scura] ran into me last week saying that you're duckin' somebody for about four weeks, somebody new, that he never even told me about, that I've really wasn't too thrilled with him that he never even told me, what's that uhhh, what's that uh, what's that all about?
>
> John Doe #14: Wait, say that again? So, the friend, my friend's father, the kid from Brooklyn you're talking about?
>
> Scorcia: No, no, not him, those guys are done
>
> John Doe #14: Ohhh! ohhh! Yeah.
>
> Scorcia: Uhhh, from across the street from your house, where you're living, from the apartment
>
> John Doe #14: Yeah, yeah, okay, what did he say?
>
> Scorcia: He said there was somebody else that he had hooked you up with that you'd been avoiding for a couple of weeks?
>
> John Doe #14: No! What the fuck are you talking about? That he hooked me up with? Oh, oh, oh, you're talking about the kid from across the street.
>
> Scorcia: Yeah.
>
> John Doe #14: Oh! Yeah, eh, that's something different, yeah.

2

| | |
|---|---|
| Scorcia: | Yeah, he told me you were avoiding his call or something or whatever. |
| John Doe #14: | I didn't avoid him, no! I didn't avoid his call. |
| Scorcia: | You just talk, [UI], just, just talk to, just talk to me in person, I, if you don't see me by, if you don't see me by 6:00, when I'm on my, when I'm heading in, where I'm c, I'm gonna be on, I'm gonna be in Jersey tonight, when I'm heading in, you'll meet me by, you'll meet me by Alverson, at 12:00, 11:30, I'm not staying out too late, 'cause my wife cut her flight short, she'll be home by 11:00, my wife tonight |
| John Doe #14: | Yeah, UI...okay...that's [UI], that's fine, whatever we gotta do...yeah...yeah...yeah, that's fine. |

When Scorcia said, "your friend's buddy, the father, ran into me last week sayin' that you're duckin' somebody for about 4 weeks," he meant that the defendant ("the father") approached Scorcia a week earlier to tell him that John Doe #14 had not made interest payments in four weeks. When Scura said, "I don't want to go over the phone," he meant that he did not want to speak about the debt over the telephone because his communications were criminal in nature and wanted to avoid detention by law enforcement.

On April 29, 2019, Scorcia and John Doe #14 exchanged the following messages about the efforts by the defendant, whose nickname is Vinny Linens, to collect the debt:

| | |
|---|---|
| Scorcia: | Did you ever call who we spoke about the other day linen (TS5 1295) |
| John Doe #14: | Ok T [a nickname for Thomas Scorcia] sounds good . I spoke to him didn't go see him thou (TS5 1296) |
| Scorcia: | K (TS5 1298) |
| John Doe #14: | Did he reach out again (TS5 1299) |
| Scorcia: | No (1300) |

On Saturday, May 4, 2019 at 11:09 a.m. (TS5 #2625), Scorcia and John Doe #14 again discussed the debt that the defendant was trying to collect. A portion of the conversation is transcribed below:

| | |
|---|---|
| Scorcia: | Maybe Monday, Tuesday or whatever we will get together with, uh, that friend of mine that you know, and, uh, get you some reduced rates or whatever go over it, you know before anything escalates. You know what I'm talking about right? |

3

| | |
|---|---|
| John Doe #14: | Yeah, why you just seen him? |
| Scorcia: | Yeah I seen him fucking this morning. Fucking 8:00 in the morning he [Scura] called me. |
| John Doe #14: | Mother fucking guy |
| Scorcia: | Your friend's dad, but uh (Talking over each other) if what you're saying is good, if that can get less, and that can get less or whatever and get everybody off your fucking back, you know just little at a time, it would be a good thing for you. All righty. (talking over each other) maybe the beginning of the week. What did you say? |
| John Doe #14: | I know, I just I didn't what you to be involved on it, honestly. |
| Scorcia: | No, I know, I know, well they called me (UI) nobody's getting nothing from me. You just need to get the, you know, the uh, to get everybody off your back. Everybody just fucking, take a little you know. |
| John Doe #14: | Yeah, it's just more stress, it's so annoying you know what I mean. |
| Scorcia: | I know, better than them, fucking looking for a big, yeah. |
| John Doe #14: | He is annoying because, like, I don't know |
| Scorcia: | Listen you see me before hand in person okay. |
| John Doe #14: | Yeah. |
| Scorcia: | Maybe I might see you tomorrow anyway or whatever. |

(A review of pen register data shows that Scura called Scorcia on May 4, 2019 at 8:54 a.m.) In this conversation when Scorcia said, "Your friend's dad," he was referring to the defendant. In this telephone call, Scorcia related to John Doe #14 that he had met with the defendant ("I seen him fucking this morning") and proposed that the defendant, Scorcia and John Doe #14 meet the following week to reduce the interest rate to be paid by John Doe #14 ("get you some reduced rates"). When Scorcia said that they should meet "before anything escalates," Scorcia was implicitly warning John Doe #14 that if he did not attend the meeting and find a means to make payments (even if at a lower rate), there would be potential consequences to his physical safety.

Two minutes later, at 11:11 a.m. (TS5 #2626), John Doe #14 called Scorcia and they had the following conversation,

| | |
|---|---|
| John Doe #14: | He wasn't like bad mouthing me, was he? Because. |

4

| | |
|---|---|
| Scorcia: | No, definitely not, (UI) he's looking to help ya. Definitely not fucking bad mouthing you. |
| John Doe #14: | All right, no because I'm supposed to see him like later, like at 1:00. |
| Scorcia: | No he didn't, listen he didn't bad mouth you. He's only looking to help you. I told him to make sure those kids give you all good leads over there while you're working, which will be good and just keep you fucking busy like that and everything's going to be good. When, if you see him at 1:00 say, "T called and said we're going to get together for coffee the beginning of the week." |
| John Doe #14: | Ok, yeah 'cause I'm supposed to go by his store, and he told me he was in Brooklyn, he was like I'm leaving Brooklyn or whatever, so that's why when he called me, I figured that.... |
| Scorcia: | Yea, I was in Brooklyn, I had to go to Brooklyn anyway. |
| John Doe #14: | Yea, so I guess you were seeing him, alright, whatever so I'll see him later, but..... |
| Scorcia: | Just say, "Hey, T called me, says that we're gonna get together for a cup of coffee, all good" or whatever you know. |
| John Doe #14: | Okay, no problem. |

When Scorcia told John Doe #14 that he was not "bad mouthing" him and that he was "looking to help" him, Scorcia was trying to set John Doe #14 at ease to ensure that he would attend the meeting with Scorcia. When John Doe #14 said, "I'm supposed to go by his store," he meant that he had plans to meet the defendant at a commercial establishment. (SCURA operates a pizzeria in New Jersey.)

***

The defendant was arrested on October 3, 2019 and was released the same day on a bond. On October 28, 2020, Scura pleaded guilty to conspiring to collect an extortionate extension of debt (the offense charged in Count Thirty of the superseding indictment).

# DISCUSSION

I.  The Defendant's Objections to the PSR

The defendant objects to components of the PSR. First, the defendant objects to its characterization of his membership in the Colombo organize crime family of La Cosa Nostra. The government submits that this information is accurate and properly included in the PSR. Multiple confidential sources have identified the defendant as an inducted member of the Colombo family and their information is corroborated in large part by surveillance and wiretap intercepts (showing his close relationship with other members of the crime family). The defendant's membership in the crime family is also relevant to the charged offense insofar the defendant's status in the crime family allowed the defendant to interact with Scorcia in order to obtain his help in collecting the debt owed by John Doe #14 to CC-1. Even more significantly, the defendant was able to use his status as an inducted member and the violent reputation of the Colombo family to communicate to any debtors, including John Doe #14, the consequences of failing to make timely payments.

The defendant also argues that the Probation Department should have included a two-level role reduction based on the defendant's minor role in the offense. The government agrees. In the government's view, the defendant played a lesser role than that of CC-1 who extended the loan, regularly called John Doe #14 to obtain payment of the interest owed and sought Scura's assistance in collecting it.

II.  The Guidelines Calculation

The government submits that the following Guidelines calculation applies. The defendant stipulated to this calculation in the plea agreement.

Extortionate Collection of Credit – John Doe #14

| | |
|---|---:|
| Base Offense Level (§2E2.1(a)) | 20 |
| Less: Minor Role (§3B1.2(b)) | -2 |
| Less: Acceptance of Responsibility (§ 3E1.1) | -3 |
| Less: Global resolution (§5K2.0) | <u>-1</u> |
| Total: | <u>14</u> |

This total offense level, combined with a Criminal History Category I, carries a range of imprisonment of 15 - 21 months.

III.   A Sentence Within the Applicable Guidelines Range is Warranted

The government respectfully submits that, in this case, a sentence within the advisory Guidelines range is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

   A.   Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

   B.   Analysis

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range – and not a sentence of 6 months' imprisonment and 6 months' home confinement, as requested by the defendant – is appropriate in this case.

      1.   The Nature and Circumstances of the Offense

The defendant has been convicted of a serious crime: extortionate collection of an extension of credit, a crime he committed under the auspices of the Colombo crime family. When, as here, a loansharking customer fails to timely repay a loansharking loan, members and associates of the Colombo family, like the defendant, use the violent reputation of the Colombo family and its vast resources, and engage in violence if necessary, to ensure that the customer pays. Because loansharking operations allow dangerous criminal organizations such as the Colombo family to earn money, these crimes are necessary for the Colombo family's survival. And, because loansharking can lead to violent debt collection, this crime is particularly serious and warrants a sentence with the Guidelines range.

2. The Defendant's History and Characteristics

As discussed above, the defendant's history and characteristics show that he is committed to the goals of the Colombo crime family. While the defendant does not have a prior criminal history, he has long been associated with La Cosa Nostra and was previously inducted as a full-fledged member of the Colombo crime family. In becoming an inducted member, the defendant took an oath swearing allegiance to its goals and to place the crime family above all else, including his own family. In sum, the defendant's history and characteristics also supports a sentence within the Guidelines range. 18 U.S.C. § 3553(a)(1).

3. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offense – the use of extortionate means to collect an extension of credit -- is serious, particularly when his membership in the Colombo crime family is considered. In addition, by engaging in criminal activity with the Colombo crime family, the defendant has demonstrated that he lacks respect for the law.

4. Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

a. Specific Deterrence and Incapacitation

In this case, specific deterrence and incapacitation are critical. When the defendant became a member of the Colombo crime family, he took an oath, swearing to remain loyal to this violent criminal organization for the remainder of his life. The government respectfully submits that despite numerous claims to the contrary at sentencing proceedings, aside from those who decide to cooperate against members of the mafia (and therefore are not permitted to maintain a connection to the mafia upon disclosure of their cooperation), few if any members of the mafia give up their connections to the mafia even after serving significant terms of imprisonment.

A sentence within the Guidelines range will, however, at least incapacitate the defendant, thereby protecting the public from further crimes he would otherwise commit during that period of time. Given the need for deterrence and incapacitation, the government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(C).

### b. General Deterrence

In addition, a sentence within the advisory Guidelines range is necessary to deter others who are in a position to choose between a law-abiding life and a life of crime.

### 5. Avoiding Unwarranted Disparities

Finally, a sentence within the Guidelines range is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## IV. A Fine Within the Guidelines Range Is Warranted

The government also asks the Court to impose a fine. Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998). In this case, the defendant cannot sustain this burden. The government respectfully submits that the sentence in this case should include a fine within the advisory Guideline range of $10,000 to $95,000. U.S.S.G. § 5E1.2(c)(3).

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence within the applicable Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By: /s/
Elizabeth Geddes
Megan E. Farrell
James McDonald
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (BMC) (by ECF)
Roberta Houlton (by e-mail)
Vincent Martinelli, Esq. (by ECF)